**In re VVF COMMUNICATIONS CORPORATION d/b/a VVF Broadcasting Company, Inc. a/k/a Radio Station WTKO, Debtor.**

**Bankruptcy No. 82–00365.**

United States Bankruptcy Court, District of Columbia.

June 18, 1984.

Kevin R. McCarthy, Washington, D.C., Louis A. Scarcella, New York City, for debtor.

Eric L. Bernthal, Alan S. Dubin, Washington, D.C., for Chem Credit, Inc.

Norman E. Oliver, Boston, Mass., Atty., Office of U.S. Trustee.

Thomas J. Wincek, pro se.

Robert Sniffen, pro se.

Frank Boyle, pro se.

## OPINION, INCORPORATING FINDINGS AND CONCLUSIONS, AND ORDER DENYING MOTION FOR STAY PENDING APPEAL

GEORGE FRANCIS BASON, Jr., Bankruptcy Judge.

This matter came on for hearing before the Court on June 5, 1984 on the motion of the Debtor for a Stay pending appeal of an order entered by this Court on May 24, 1984 appointing a trustee. The Court, having heard arguments of counsel and the testimony of three witnesses, and having reviewed the pleadings and the record of this case, denies the motion for stay and renders the following opinion, incorporating findings of fact and conclusions of law, and order:

### I. *Introduction.*

1. The Debtor's motion for stay is predicated upon its assertion that key personnel at its radio station, located at Ithaca, New York, will resign their positions if this Court adheres to its order appointing a trustee. In support of this assertion, the Debtor produced three letters, two of which reflect the resignation of sales staff effective June 1, 1984. The third letter is from Station Manager Wendy Paterniti to the Debtor's counsel, expressing concern about the "difficulties" of filling positions

"[w]ith a trustee 'lurking' in the background." Nevertheless, Ms. Paterniti testified at the hearing on the motion that she had in fact filled the two sales positions within a little over a week.

2. At the hearing, the Debtor presented three witnesses. One was Ms. Paterniti, whose testimony went beyond her letter to state that she, too, would accept other employment if a trustee were appointed. Similar testimony was offered by the station's Program Director, Wayne Fisk, and its President and Sales Manager, Robert Newman. Each of the witnesses also testified that the loss of these employees would result in a loss of the station's audience and, hence, its "number one" rating in the Ithaca radio market, thus causing a decrease in advertising revenue and hence in the value of the Debtor's estate. The Debtor did not produce the signatories to the two letters of resignation, nor did the Debtor produce any other evidence to support its dire predictions.

3. The Court observed and listened to the Debtor's witnesses with great care, especially because the Court has found to be inherently unbelievable the testimony of Ellis Erdman, who was the Debtor's sole witness at the May 16, 1984 hearing concerning appointment of a trustee and who is the individual that would be ousted from control of the Debtor by appointment of a trustee. The Court now finds the testimony of the Debtor's first two witnesses, Robert Newman and Wayne Fisk, also to be unbelievable. (Ms. Paterniti's testimony too is unbelievable to the extent it simply parallels that of Messrs. Newman and Fisk.) Neither Newman nor Fisk could offer a rational basis for his purported unwillingness to work at the radio station if a trustee were appointed, regardless of who that trustee might be or what his plans for the future of the station might be. Under cross-examination, Program Director Fisk admitted that he has always been "on the lookout" for a new job and conceded that he has sent out over fifty audition tapes to prospective employers in the relatively short time in which he has worked at Station WTKO, all well before

the issue of a trustee had arisen. It was also brought out in cross-examination of this and the other witnesses that the station has long experienced a high turnover of program directors, and has nevertheless maintained its "number one" rating, its revenues and its value.

4. Neither Fisk nor Newman could explain why the appointment of a trustee would cause them to leave the station immediately even though neither the considerable adverse publicity concerning this case over the past two years nor the presence of a court-appointed receiver (during a previous period of years of receivership) had caused either of them to seek other employment. Cross-examination also revealed that there has been substantial turnover at the station over the years at all levels of the staff, without apparent harm to the station's business. The court finds adversely to the Debtor with respect to both the demeanor and the credibility of these two witnesses.

5. At best, the employees of Radio Station WTKO who testified in this proceeding, as well as the two who sent letters of resignation, are victims of gross distortions of this Court's order appointing a trustee in this case. Management of the Debtor has not seen fit to disabuse these employees of such gross distortions. The witnesses' major purported reason for leaving immediately was that this Court's order for appointment of a trustee compelled the trustee to sell the Station at forced-sale value. This Court's order of appointment does no such thing. Indeed, this Court went out of its way to point out both in its oral ruling from the bench on May 16th and more briefly in the written order of May 24th that a trustee would *not* be required to sell the Station. The Court made a rather lengthy statement from the bench in the presence of both Mr. Erdman and the Debtor's New York counsel, Martin Brecker, designed to assuage Mr. Erdman's apparent fears. The Court pointed out that a trustee would to a large extent perform the same functions as the prior court-appointed receiver, whose presence had not resulted

in any unusual employee turnover or any diminution of market share, sales or value. The Court pointed out that Mr. Erdman's interest as guarantor of secured corporate debts coincided with the Chapter 11 trustee's duty to preserve and protect the going-concern value of the business for the benefit of all parties, including secured and unsecured creditors and stockholders. The Court expressed its confidence that the United States Trustee for this District would take pains to appoint as trustee a competent individual who would be eager to cooperate so as to assure a smooth transition.

6. Apparently the Court's words fell on deaf ears. According to Mr. Newman's testimony, he and Mr. Erdman had no communication at all with each other between the May 16th hearing on the motion for appointment of a trustee and the June 5th hearing on the motion for stay pending appeal. If true, this testimony would reveal an extraordinary lack of effort on Mr. Erdman's part to keep the Debtor's allegedly key personnel informed of the true facts, in the face of inaccurate news reports which (the testimony revealed) were being put forth by competing media. Indeed, Ms. Paterniti testified that her letter to counsel Martin Brecker requesting help in answering prospective employees' "questions concerning a trustee" was answered with a cryptic response to the effect that he had no information at that time.

7. This Court does not believe Mr. Newman's testimony that he and Mr. Erdman had no communication between May 16th and June 5th. This testimony was contradicted by the other two witnesses. They testified that Mr. Erdman, rather than remaining silent, did address the Station's key personnel concerning the Station's future soon after the May 16th hearing and even before the written May 24th order was entered. But, far from passing on to the key employees this Court's reassurances, Mr. Erdman actually fanned the flames of their fears and uncertainties by predicting to them that appointment of a trustee would inevitably lead to sale of the Station at a forced-sale price.

8. Based on the facts set forth in paragraphs 6 and 7 above, this Court finds and concludes that any damage which may have accrued or may hereafter accrue to the Debtor relating to the appointment of a trustee is self-inflicted, the result of the above-described acts and omissions by Messrs. Erdman and Brecker, and not the result of any action by this Court. The Court further finds and concludes that the Debtor and counsel are estopped to rely on the natural and probable results of their own conduct as a basis for seeking a stay.

9. The Debtor's President, Robert Newman, also testified that he understood he would automatically lose his retirement benefits as well as any other benefits as a result of appointment of a trustee. That, however, is absolutely not the law. Again, neither the Debtor's management nor the Debtor's attorney chose to disabuse Mr. Newman of this erroneous belief. Mr. Newman testified he had consulted his own attorney, but he chose not to present a letter from that attorney, in which he claimed to have been told that his retirement benefits would be lost by the appointment of a trustee. It is clear that Mr. Newman either received bad legal advice or misunderstood the advice he did receive. As explained in paragraphs 16 and 17 below, any difficulties encountered by Mr. Newman in collecting his retirement benefits will be attributable to the two year delay by the Debtor in this case, not to any action taken by this Court or to be taken by the trustee when appointed.

## II. *Legal Standard For Stay Pending Appeal.*

10. There is little controversy between the parties as to the appropriate legal standard to be applied on this motion for a stay pending appeal. The accepted standard is described in *Virginia Petroleum Jobbers Ass'n. v. F.P.C.*, 110 U.S.App. D.C. 339, 293 F.2d 527 (1961). That same four-prong test which our own Court of Appeals has prescribed in *Virginia Petroleum Jobbers* for appeals from administra-

tive agencies applies also in appeals from bankruptcy courts. As succinctly described in *In re Wymer*, 5 B.R. 802, 806, 6 B.C.D. 855 (Bankr.App. 9th Cir.1980), quoting with approval from *Schwartz v. Covington*, 341 F.2d 537 (9th Cir.1965), in order to prevail an appellant must show:

"1. Appellant is likely to succeed on the merits of the appeal.

"2. Appellant will suffer irreparable injury [if no stay is granted].

"3. No substantial harm will come to appellee [by reason of a stay].

"4. The stay will do no harm to the public interest."

■ 11. An appellant must meet all four of these requirements in order to obtain a stay. In this case the Court concludes that appellant has failed to meet any one of them. Moreover, in this case, the debtor through counsel has conceded that it is unable to post a supersedeas bond in any meaningful amount, or in any other manner to provide appropriate security as required by Bankruptcy Rule 8005. Thus, the Debtor is asking this Court for a truly extraordinary exercise of discretion in its behalf. Such discretion is plainly not warranted here.

### A. *Probability of Success On the Merits.*

12. As to the first element prescribed by *Virginia Petroleum Jobbers,* probability of success on the merits, this Court finds and concludes that the debtor is not likely to succeed on the merits, either in its substantive argument (that this Court should not have appointed a trustee) or its procedural argument (that this Court should not have excluded certain evidence) for the following reasons:

1. The Debtor argues that its Agreement, which requires appointment of a trustee under circumstances different from those Congress has enumerated in 11 U.S.C. § 1104(a), is void. The Debtor cites only one case, *Massillon-Cleveland-Akron Sign Co. v. Golden State Advertising,* 444 F.2d 425 (9th Cir.), *cert. den.,* 404 U.S. 873, 92 S.Ct. 100, 30 L.Ed.2d 117, *reh. den.,* 404 U.S.

### (a) *Was the Order for Appointment of A Trustee Clearly Erroneous?*

13. The recent decision by Judge Thomas A. Flannery of the United States District Court for the District of Columbia in *In re Brown,* 31 B.R. 583, 584–585 (1983), sets forth with precision the correct legal standards that apply relating to appointment of a trustee in a Chapter 11 case and an appeal therefrom:

"Although those seeking the appointment of a trustee bear a heavy burden to overcome the presumption that a debtor should remain in possession of his property, the decision of the Bankruptcy Court to appoint a trustee must be upheld unless clearly erroneous. ...

"Appellants correctly state that the powers of the bankruptcy court under section 1104(a)(1) are limited to a determination of whether 'cause' exists for the appointment of a trustee, such cause being in the nature of 'fraud, dishonesty, incompetence or gross mismanagement.' ... But Section 1104(a)(2) embodies a more flexible standard under which the court may engage in a cost benefit analysis to determine whether the appointment of a trustee would be in the interests of creditors, other equity holders, and other interests of the estate."

■ 14. In this particular case not only are the standards of both subsections (a)(1) and (a)(2) of § 1104 met, for the reasons described in paragraphs 15–18 below, but also two additional reasons for appointment of a trustee are apparent on the record:

(a) One of those reasons is the debtor's prior consent. In September 1983 the Debtor entered into a Memorandum of Agreement, in which the Debtor agreed *inter alia* to make monthly interest-only payments to its first and second lien secured creditors.[1] In the strongest possible

961, 92 S.Ct. 308, 30 L.Ed.2d 280 (1971). That case involved a special patent-law doctrine "favoring the full and free use of ideas in the public domain" and held that a court-sanctioned agreement not to contest the validity of a patent was void as contrary to this doctrine. By contrast, in the Bankruptcy Code Congress has expressly mandated considerable flexibility by

language, Section 4(c) of that Memorandum of Agreement provides that the Debtor "unconditionally consents in advance" to the appointment of a trustee if payments were not kept up to date; and it further provides that the Debtor could not defend against such appointment except on the basis that no default had occurred. The Debtor appeared before this Court in March of this year, requesting the Court to approve the September 1983 Memorandum of Agreement. This Court questioned the Debtor's counsel closely, and sought to determine whether the terms of the Agreement would be beneficial to the Debtor. The Court would not have approved the Agreement without the belief that it was consented to by all parties and was in the best interests of the estate. The Debtor has not denied (nor could it deny) consenting to the Agreement in September 1983 and requesting this Court to approve the Agreement in March 1984. The Debtor is bound by that consent and that request. (For discussion of the Debtor's contention that it should not be bound, see Footnote 1 above and ¶¶ 19–23 below.)

(b) The other reason which is not specifically set forth in § 1104(a) but which in this Court's opinion nevertheless justifies appointment of a trustee in this case is as follows: As this Court stated in its May 17, 1984 Order, specific "cause," as defined in 11 U.S.C. § 1112, exists for this case's dismissal or conversion to Chapter 7 of the Bankruptcy Code. Either dismissal or conversion of this case is a much more drastic creditor's remedy than is the appointment of a Chapter 11 trustee. Therefore, if "cause" exists for dismissal or conversion, a fortiori cause exists for appointment of a Chapter 11 trustee. As pointed out in Con-

clusion 4 of this Court's May 24th Order, at least three of the nine specific listed grounds justifying dismissal or conversion appear in this case: the Debtor failed to comply with this Court's order directing it to file a plan within eight weeks after March 6, 1984 (11 U.S.C. § 1112(b)(4)); the Debtor has been guilty of unreasonable delay that is prejudicial to creditors (11 U.S.C. § 1112(b)(3)); and, as the Debtor conceded at the May 16th hearing, the Debtor is unable to effectuate either of the plans it has proposed in this case (11 U.S.C. § 1112(b)(2)). Nor, for that matter, could Debtor's counsel project any date by which the Debtor might be able to file a viable plan in the future. (For further discussion concerning prejudice to creditors resulting from the Debtor's unreasonable delay, see ¶¶ 16–17 below.)

15. Sufficient evidence was presented at the hearing on May 16th to enable the Court to determine, and the Court has determined and now states for the record, that there was both "incompetence" and "gross mismanagement" of the Debtor's affairs by current management,[2] within the meaning of 11 U.S.C. § 1104(a)(1) and § 151104(a)(1), because of that management's presentation of one plan and then another when it should have been obvious to any reasonable person that there was no hope of either plan succeeding; and because of that management's gross miscalculation regarding the acquisition of the Jarrell Oil Co., resulting in the debacle that Jarrell was placed in a Chapter 11 bankruptcy proceeding as the result of an involuntary creditors' petition only weeks after the Debtor's principal bought Jarrell in the expectation of using Jarrell to resuscitate the Debtor.

permitting appointment of a trustee either "for cause" or "in the interests ... of the estate" (11 U.S.C. § 1104(a)(1) and (2)) and has stated that even these broad standards are not limiting. See 11 U.S.C. § 102 "In this title ... (3) 'includes' and 'including' are not limiting ..." The public policy interests involved in this case are the interests in enforceability of contracts in general, and enforceability of contracts designed to expedite litigation or to settle disputes, in particular.

**2.** The Court refrained from stating this holding on the record at the May 16th hearing or in the May 24th order in the misplaced hope that such restraint would avoid adverse publicity by competing media and could forestall resentment and lack of cooperation by Mr. Erdman with whoever is appointed trustee.

16. The "more flexible standard"[3] of § 1104(a)(2) and § 151104(a)(2) is also of course met in this case. Appointment of a trustee is "in the interests of creditors, any equity security holders, and other interests of the estate" because the debtor has been unable to come up with any reasonable plan within the last two years. Such delay is especially prejudicial because it erodes the value of the estate for all creditors (except possibly the first-lien creditor). Interest continues to accrue on lien creditors' claims for so long as the case is delayed, until the equity in the estate's principal asset is completely eaten up, leaving all other creditors and all equity security holders with nothing. As the Court noted in the case of *In re McCall,* 34 B.R. 68, 69 (Bankr.E.D.Pa.1983):

> [T]he debtor's failure to pay the monthly charges to the mortgagees constitutes poor handling of the affairs of the estate, if not "incompetence or gross mismanagement of the affairs of the debtor by current management." This, coupled with the fact that interest on the second mortgage is accruing . . . is depleting the value of this asset (to the substantial detriment of unsecured creditors) and bespeaks the incompetence and gross mismanagement by the debtor of her affairs.

The *McCall* court appointed a trustee because two years had passed without any payments to either secured or unsecured creditors. Virtually the same situation exists here, except that the interest accruals are vastly larger here than in *McCall.*

17. If there now remains any equity in the estate, interest is accruing in this case at the rate of approximately $13,000 per month on the first lien and $7,500 per month on the second lien. Since this case began, therefore, it appears that interest accruals have eaten away well over $400,-000 out of the estate.[4] The Court will not permit the Debtor to continue to spin its wheels with first one and then another unrealistic, "pie-in-the-sky" proposal, while the estate continues to be eaten up with interest accruals. Appointment of a trustee will inject a needed element of realism into the operation of the Debtor's affairs.

18. Thus, the Court concludes that the Debtor has completely failed to show any probability of success on the merits of its argument that this Court's substantive decision to appoint a trustee was clearly erroneous.

(b) *Was Exclusion of Profferred Evidence Clearly Erroneous?*

■ 19. This Court also believes the Debtor will be equally unsuccessful in its argument that this Court's decision to exclude evidence at the May 16th hearing was clearly erroneous. The proffered evidence which was excluded consisted entirely of oral testimony, mostly that of Ellis Erdman, to the effect that there were mutual mistakes of fact and changed circumstances which should relieve the Debtor from the September 1983 Agreement in which the Debtor consented to appointment of a trustee if it failed to make monthly interest payments to secured creditors.

20. The Debtor's counsel proffered that this evidence would show that: (i) the Debtor believed and intended, as the other contracting parties knew, that apart from the Debtor's own cash resources, the monthly payments would be funded solely by profits from Jarrell Oil Company and (ii) the Agreement was premised entirely on that understanding and (iii) then, when Jarrell was itself placed in an involuntary Chapter 11 case shortly after the Agreement was signed, the mutual mistake became apparent; and (iv) Jarrell's Chapter 11 bankruptcy also constituted changed circumstances. This Court ruled that evidence of mutual mistake or changed circumstances based on events occurring af-

---

3. *In re Brown, supra,* 31 B.R. at 585.

4. The only payments the Debtor has made in this case total approximately $65,000 to the first and second lienors. Those payments were made pursuant to the September 1983 Agreement prior to the Debtor's default. Had those payments not been made, interest accruals would by now total approximately half a million dollars.

ter March 6, 1984 would be admitted, but that such evidence relating to events occurring before that date would not be admitted. The reasons for that ruling were as follows:

21. March 6, 1984 was the date on which the Debtor's then counsel appeared before this Court and requested the Court to approve the September 1983 Agreement. The Debtor's counsel then represented that the Agreement was in the best interests of all parties.[5] The Court would not have approved the Agreement but for this representation. On March 6, 1984 it was well known to all parties, including both the Debtor and the Debtor's counsel, and it was a matter of public record and was known to the Court, that Jarrell Oil was in its own Chapter 11 case and could not possibly be relied upon to fund this Debtor's monthly payments under the September 1983 Agreement. Yet, not one word did Debtor's counsel say to the effect that the Debtor would be unable to meet its obligations under the Agreement as worded because of Jarrell's predicament. No mention was made of either mutual mistake or changed circumstances, even though the facts were then well known.

22. Therefore, the Court has concluded and now states for the record that pre-March 6, 1984 evidence should be excluded under each of three legal doctrines: (a) waiver, (b) equitable estoppel and (c) judicial estoppel.

(a) By failing even to mention the alleged mutual mistake or changed circumstances at a time after the relevant events had already occurred and at a time when those matters should have been raised if at all, the Debtor has waived any right to rely on those matters in support of its position.

(b) The other parties to the Agreement relied to their detriment upon the Agreement and upon the Debtor's request that the Court approve the Agreement and upon the Court's approval of the Agreement, because in reliance on those actions made or caused by the Debtor they refrained from seeking dismissal or conversion of this case or other remedies despite the long delays and lack of progress in the case. See ¶ 5 of the Agreement, specifically relating to the secured creditors' agreements not to file motions to dismiss or to convert or to appoint a trustee or to be permitted to foreclose, for so long as the Debtor made its monthly payments. That forbearance was predicated on the belief and agreement that, if the Debtor failed to make its monthly payments, there would be a consent appointment of a trustee. Having induced the secured creditors to rely upon the Agreement and upon this Court's approval of the Agreement, the Debtor is estopped and cannot now invoke the equitable powers of this Court to set aside the enforcement of that agreement, when it alone has failed to comply with the provisions of the Agreement.

(c) The most recent decision in this jurisdiction dealing with the doctrine of judicial estoppel is (now Chief) Judge Robinson's opinion in *Donovan v. U.S. Postal Service*, 530 F.Supp. 894, 902 (1981). As Judge Robinson there observed:

> Judicial estoppel "precludes a party from taking a position inconsistent with one previously taken with respect to the same facts in an earlier [or the same] litigation .... Its purpose is to prohibit litigants from "playing 'fast and loose,'" .... or blow[ing] hot and cold," .... with the courts, and is designed to "protect the integrity of the courts and the judicial process."

In this case the Debtor should not be permitted to play fast and loose with this Court by requesting in March that the Court approve the Agreement and representing to the Court in March that the Agreement was in the Debtor's and the estate's best interests, and then coming back into Court in May taking exactly the

---

**5.** The Debtor has referred to "strained relations" and "lack of communication" between its management and its then attorney around that time. However, the Debtor did nothing on or prior to March 6, 1984 to revoke or restrict that attorney's authority to appear in court and to make representations in court on its behalf.

opposite position, based on facts fully known to the debtor in March.

23. The Court also found and concluded and now states for the record that the proffered testimony was inherently incredible, and allowing its introduction would have been a futile waste of the litigants' and the Court's time. The Debtor's counsel conceded that there was not one scrap of paper that would lend any credence whatsoever to the proffered testimony. Opposing counsel made clear that they and their clients vigorously disputed the contention that the Agreement was solely predicated, as to outside funding, on Jarrell Oil Company. The September 1983 Agreement is a lengthy, carefully crafted legal document. It is devoid of any reference to Jarrell at all. It includes the explicit representation in Section 6(b), that "There are no restrictions, promises, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein." In the fact of all this, it strains credulity to the breaking point to contend that the secured creditors had agreed to an unexpressed precondition to the effect that the Agreement would not be operative or enforceable against the Debtor unless Jarrell could provide all needed outside funding of the Debtor's monthly obligations. The Court's conclusion in this regard was only reinforced by the Court's later observation of Mr. Erdman's demeanor on the witness stand and his testimony. As noted above (¶ 3), the Court found him to be an unbelievable witness. There is no rule of law that requires a court to hear incredible testimony from an unbelievable witness.

### B. *Irreparable Injury.*

24. The second element which an appellant must establish under *Virginia Petroleum Jobbers* is irreparable injury to the appellant. In this case, the Court finds and concludes that there is no injury at all, much less irreparable injury. The only thing that has actually happened is that two low-level employees resigned and were promptly replaced. In view of the testimony, and based on the Court's observation of the three witnesses, the Court finds and concludes that any further resignations are either speculative (as to one witness) or will be comprehended within normal turnover (as to another), and (as to the third) it may well be in the best interests of the estate to terminate that witness's services. Even if all the Station's employees resigned *en masse* (and there was no testimony that this would in fact happen), there was no showing that they could not be promptly replaced. In fact, the evidence was that there has been constant, frequent turnover of personnel at the radio station. Nor was there any evidence, apart from the witnesses' unsupported and unbelievable testimony, of any causal connection between turnover of personnel and loss of rating. In fact, the record of this case shows quite the contrary: the station has in fact maintained its top rating despite frequent turnover of personnel. Moreover, to any extent that the turnover may be more pronounced now than in the past, that turnover will have been generated by what appear to be present management's own acts and omissions in failing to correct misinformation and in generating fears and uncertainties among employees. That situation is easily correctable by the Debtor and its counsel; and it should be corrected promptly.

25. Chem Credit has pointed out in its pleading that the uncertainty caused by a stay pending appeal would be far more harmful than the appointment of a trustee. It appears to the Court, based on testimony of all the witnesses, that the greatest service this Court could do for them would be to request the U.S. Trustee to appoint a trustee as soon as possible, so that the employees will be comforted and their fears allayed, and they can be reassured that, despite present management's predictions, appointment of a trustee is not the "death knell" for this station nor the end of their jobs. If the employees are doing a competent job, there is no reason for the trustee to discharge them.

26. Finally as to irreparable injury, this Court at all times retains the power under

11 U.S.C. § 151105 to "terminate the trustee's appointment and restore the debtor to possession and management of the property of the estate, and operation of the debtor's business." Thus, if at any future date facts occur which lend any credence at all to the Debtor's present alleged fears, the Debtor can file a motion which can be heard and acted upon by this Court in all probability much more quickly than could an appeal.

### C. *Injury to Others.*

27. The third element which an appellant must establish under *Virginia Petroleum Jobbers* is lack of injury to opposing parties or others. In this case, the Court has already pointed out the substantial injury to creditors which has already occurred in this case as a result of the Debtor's delays (¶¶ 16 and 17 above). Every day of continued delay results in further substantial interest accrual and further diminution of the value of the estate. The Debtor's record in this case to date strongly suggests that continued possession will result only in continued delay and procrastination, to everyone's detriment.

### D. *Public Interest.*

28. The fourth element which an appellant must establish under *Virginia Petroleum Jobbers* is the public-interest element. In this Court's opinion there is no public-interest consideration that would justify imposition of a stay. *See also* Footnote 1 above, referring to the public policies in favor of enforcement of contracts and especially in favor of enforcing consenual agreements for expediting litigation or settling disputes, such as the Debtor's September 1983 Agreement.

### III. *Conclusion.*

29. It is clear, therefore, that the Debtor has failed on each and every one of the four tests it must meet in order to obtain a stay pending appeal.